379 A.2d 1098.

REGO DISPLAYS, INC. *vs.* LOUIS FOURNIER *et al.*

NOVEMBER 23, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

470

Doris, J. This is a civil action brought to enjoin the defendants[1] from solicitation of the plaintiff's customers, and to seek compensatory and punitve damages for unfair competition, interference with contractual relations, and breach of trust and confidence. The defendant Louis Fournier is a jewelry display designer and former employee of the plaintiff corporation, which manufactures jewelry display units. The cause was heard by a justice of the Superior Court, sitting without a jury. A judgment was

---

[1]No formal judgment was entered against defendant Robert Fournier, and therefore he is not a party to this appeal.

entered permanently enjoining the defendant from solicitation of the plaintiff's specifically listed Rhode Island customers and awarding the plaintiff compensatory damages totalling $3,391.23 plus costs. Punitive damages were denied. The defendant now appeals to this court.

Rego Displays, Inc. (Rego) employed Louis Fournier as a display designer, sample maker, and manager of the woodworking shop. Fournier was employed without a contract from 1970 to January 1974, and from August 1974 to November 17, 1975. Joseph Soave, Rego's vice president, secretary, managing officer and salesman since 1973, developed and increased Rego's business by establishing continuing relationships with customers through referrals, jewelry representatives, and jewelry shows. Although the customers did not do business exclusively with Rego, the enduring aspect of the relationships was important because of the constantly changing trends in display design and the highly competitive nature of the business. The defendant Fournier often attended Soave's meetings with customers, both in the Rego office and at jewelry shows, and offered his expertise as designer and technician in procuring and appeasing customers. The duplication of models presented by customers and the creation of samples conforming with requested specifications are common practices in the jewelry display business. These duties devolved upon Fournier, which placed him in a confidential and responsible position in Rego's operation. Fournier was aware not only of the identities of Rego's customers, but also of their specific needs. Therefore, when Alanco Company (Alanco), a New York jewelry firm, came to Rego in January 1975 with ideas for a plexiglass display, it was Fournier who developed a display unit referred to as the U-2000 base. This unit was sold by Rego to Alanco until October 1975, when plaintiff stopped receiving orders from Alanco. Gross sales by plaintiff to Alanco totalled $16,956.75, of which $8,949.45 was attributed to the U-2000 display. The U-2000 displays sold to Alanco by plaintiff brought a profit to plaintiff of $1 per

unit. In July 1975, plaintiff increased the price of U-2000 from $2.05 to $2.25 per unit. Sometime in July, defendant had begun manufacturing displays in his basement with a view toward establishing his own independent business and did his first work on his own in September 1975.

As Alanco's representative had complained of Rego's increased price for the U-2000 unit, defendant Fournier took the opportunity to obtain orders from Alanco for the U-2000 base Fournier was manufacturing on his own at a price of $1.95 per unit. The defendant received his first order form Alanco in October 1975. Fournier did not inform anyone at Rego of his private manufacturing business or of his dealings with Alanco. The defendant testified that he never did any of his business on plaintiff's time, but worked in the basement of his home from 5 p.m. to 12 p.m. He claimed that he never saw plaintiff's actual customer list and never made a copy of the list. Fournier testified he delivered 2,116 U-2000 units to Alanco in the period from October through December 1975, and that 1,250 units were in progress. The defendant was dismissed from employment with Rego on November 17, 1975, one day after Joseph Soave learned of Fournier's activities.

The focus of the issues in this case is on the question of balance between an individual's right to entrepreneurial freedom and the need to protect established business concerns from unfair competition. The remedy chosen is of equal importance with the substantive matters of the case in achieving an appropriate balance, and will be so considered. The defendant contends that the trial justice incorrectly balanced the public interest in free competition and individual freedoms against one's right to the protection of business assets. He further asserts that plaintiff's customer list was not a trade secret and that damages are excessive.

It is well settled that where parties have submitted their cause to a trial justice sitting without a jury, the findings of

fact of the trial justice will be given great weight, *Ducharme* v. *Champagne,* 110 R.I. 270, 292 A.2d 224 (1972); *F.D. McKendall Lumber Co.* v. *Buratti,* 107 R.I. 158, 265 A.2d 732 (1970), and will not be disturbed on appeal unless it can be shown that such findings are clearly wrong or that the trial justice misconceived or overlooked material evidence. *Raheb* v. *Lemenski,* 115 R.I. 576, 350 A.2d 397 (1976); *Barattini* v. *McGovern,* 110 R.I. 360, 292 A.2d 860 (1972).

The plaintiff argues and the trial justice determined that the problems in this case were defined and governed by *Colonial Laundries, Inc.* v. *Henry,* 48 R.I. 332, 138 A. 47 (1927). As in the instant case, *Colonial Laundries* did not involve a contract forbidding post-employment competition or the piracy of copy-righted or patented materials. The defendants were laundry wagon drivers who, upon leaving the employ of Colonial Laundries, solicitied 80% of the customers on their former routes to do business with a competitive organization. This court held that although the defendants did not actually steal a customer list, the identities of those persons on the laundry routes were carried in the drivers' memories and were misappropriated to the new business. This action appeared to be such a breach of confidence that the customer list achieved the status of a trade secret. However, this court drew a distinction in *Colonial Laundries* between route businesses and traveling salesmen, indicating that the latter were not assured of a sale from week to week, but had to acquire customers anew on each occasion. Therefore, the traveling salesman's customer list was not entitled to the same kind of protection as the route list because the traveling salesman was constantly competing to secure his customers.

In a more recent case, *Callahan* v. *Rhode Island Oil Co.,* 103 R.I. 656, 240 A.2d 411 (1968), we held that a customer list committed to memory and used in competition with a former employer would be a trade secret only if the

customer information could not be obtained through public channels. As we pointed out in *Callahan,* the general rule in the majority of jurisdictions is that absent a covenant not to compete, the use of such a memorized list will not be treated as a trade secret. However, the exception to this rule is still within the implications of *Colonial Laundries* so that if an employee greatly abuses the trust of his employer in dealing with customers, the employee may be forbidden to enjoy the fruits of his improper actions. *Go-Van Consolidators, Inc.* v. *Piggy Back Shippers, Inc.,* 111 R.I. 697, 699-700, 306 A.2d 164, 165 (1973); *Town & Country House & Homes Serv. Inc.* v. *Evans,* 150 Conn. 314, 317, 189 A.2d 390, 392-93 (1963); *Carl A. Colteryahn Dairy, Inc.* v. *Schneider Dairy,* 415 Pa. 276, 280, 203 A.2d 469, 471 (1964); *Lewis Pac. Dairymen's Ass'n* v. *Turner,* 50 Wash. 2d 762, 776, 314 P.2d 625, 633-34 (1957).

Here, although it may have been possible for defendant Fournier to have obtained the names of his employer's customers through public channels in order to compete as an independent business, Fournier's solicitation of Rego's customers while still in its employ constitutes a clear breach of confidence. Fournier's knowledge of the identities of Rego's customers coupled with his appreciation of their specific needs formed the particular basis of the employer's trust. Thus, the relationship between Rego and Fournier took on the attributes of a trade secret when it was appropriated to Fournier's private use.

Despite the extremely competitive nature of the jewelry display business, the case at bar is not analogous to the traveling salesman situation described in *Colonial Laundries.* Fournier's interference in Rego's relations with Alanco took place prior to Fournier's leaving Rego's employ, and resulted in the termination of negotiations between Rego and Alanco relating to the price of the U-2000 base. It was not a simple offer to produce a display at a cheaper price in post-employment competition. The defendant, as em-

ployee, owed a duty of loyalty to his employer. It is clear that Fournier's actions effectively precluded further discusion between Alanco and Rego on that particular requirement for U-2000 units. Therefore, we agree with the trial justice's conclusion that Fournier abused his employer's confidence to such an extent that Fournier's knowledge of Rego's customer identities became a trade secret, and that Fournier's breach of trust resulted in interference with the contractual relations between Rego and Alanco.

We also find that the trial justice was presented with sufficient factual evidence upon which to form a reasonable standard in awarding plaintiff Rego its lost profits on the orders of U-2000 bases which defendant Fournier was completing privately for Alanco. *See Smith Dev. Corp.* v. *Bilow Enterprises, Inc.*, 112 R.I. 203, 212-14, 308 A.2d 477, 482-83 (1973). The defendant has not shown that the findings of the trial justice were clearly wrong or that he has misconceived or overlooked material evidence. We therefore sustain the trial justice's award of damages to the plaintiff in compensation for defendant's abuse of confidence and interference with plaintiff's contractual relations.

It is clear that the trial justice was justified in enjoining defendant from solicitation of Alanco and other customers of Rego, considering Fournier's special knowledge of their needs. Otherwise, Fournier would obtain an unfair advantage in competing with Rego, particularly if Rego did not have an opportunity to fill Fournier's position both within the business itself and in the eyes of customers. However, as we are attempting to maintain the balance between protection from unfair competition and free trade, the permanent nature of the injunction may weigh too heavily on the side of security for established enterprises. The defendant Fournier by the terms of the Superior Court judgment is essentially foreclosed from all entrepreneurial efforts in the jewelry display business in Rhode Island. Our decision in *Colonial Laundries* did include a permanent injunction against the

solicitation by the defendant of the plaintiff's customers, although we added, as did the trial justice in the instant case, that the defendants were free to advertise and enter into business with the selected customers through any means other than direct solicitation. Even if we were to adhere strictly to the decision in *Colonial Laundries*, we would have to distinguish the instant case on the basis of the divergence between the laundry route and jewelry display businesses. By the admission of Rego's own vice president and manager, constant solicitation of customers through jewelry shows, the creation of samples and encouragement of referrals was absolutely essential to success in jewelry display. No advertising or other form of publicity was ever alluded to as an integral part of the development of a flourishing jewelry display company. It seems perhaps that this is the point at which the distinction made in *Colonial Laundries* between the route business and the traveling salesman becomes more apparent. It is probable that through advertising, the former route driver might be able to acquire the business of his former employer's customers, but it is unlikely that advertising would result in a steady flow of business for the jewelry display entrepreneur. In any case, many jurisdictions have found it inequitable to permanently restrain a defendant from soliciting his former employer's customers because of the somewhat punitive and not entirely logical effect of such an injunction. *See, e.g., Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 112 N.W. 2d 42 (1961); *United Bd. & Carton Corp. v. Britting*, 63 N.J. Super. 517, 164 A.2d 824 (1959), *modified on other grounds*, 61 N.J. Super. 340, 160 A.2d 660 (1960; *Morgan's Home Equip. v. Martucci*, 390 Pa. 618, 136A.2d 838 (1957); *Lewis Pac. Dairymen's Ass'n v. Turner*, 50 Wash. 2d 762, 314 P.2d 625 (1957).

In each of the cases cited above, a reasonable duration for an injunction against solicitation was determined to be the length of time necessary for the former employer to put

himself back in a position to compete on an equal basis. He should have the opportunity to train someone to replace his former employee and to solicit customers once again in open and fair competition. Rarely does this time extend beyond several years, and certainly this limit does not foreclose the defendant from all future solicitation. The nature of the defendant's acts which led to the unfair competition must be weighed, of course, including the probable duration of harmful effects on the plaintiff's business. We agree with the court's statement in *Lewis Pac. Dairymen's Ass'n.* v. *Turner, supra* at 776, 314 P.2d at 634, that "[t]he purpose of an injunction is not to punish the wrongdoer for past transactions, but to restrain present or threatened future wrongful acts."

Because the intent of the injunction is in large measure to maintain a balance in trade, the restraint on the defendant should last only so long as is necessary to recreate fair conditions. Considering the short cycles in the jewelry business and the constantly changing needs of customers, the confidential information to which Fourneir was privy could not give him a great advantage in competing with Rego for a very long period. Without that special knowledge, Fournier's acquaintance with Rego's customer list would be of little consequence, and would remove the case from the exception to the general rule against post-employment injunctions which we acknowledged in *Callahan.* A New Jersey case similar to the one at bar, *United Bd. & Carton Corp,* v. *Britting, supra,* involved a conspiracy among sales employees of a corrugated paper products company to divert customers to their new rival corporation prior to terminating their employment. The court enjoined solicitation of, and business with, the pirated cutomers for a period of two years. The facts were more compelling than in the instant case, since the salesmen in *United Bd. & Carton Corp.* stole materials, such as dies for stamping of customers' names on the corrugated products from their employer, and

made misleading statements concerning their employer to customers. However, the New Jersey court found that it would be inequitable to permanently enjoin the defendants not only because of the harshness to the defendant, but also because "such a policy would destroy free enterprise and the wholesome benefits which fair and honest competiton creates." *Id.* at 534, 164 A.2d at 833.

We agree with this analysis and therefore conclude that to permanently enjoin the defendant Fourner from solicitation of the plaintiff Rego's customers listed in the judgment below is inequitable, harsh and unreasonable. Rather, it appears to us to be reasonable and adequate in the circumstances that the defendant should be enjoined for a period of two years.

The judgment appealed from is sustained as to the award of compensatory damages and modified to the extent that the injunction shall be limited to a period of two years. and the case is remanded to the Superior Court.

*Higgins, Cavanagh & Cooney, Gerald C. DeMaria,* for plaintiff.

*Jules Gelade, Matthew J. Zito,* for defendants.